IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY BUCHHEIT, | ) |
| | ) Case No. 04 C 2070 |
| Plaintiff, | ) |
| | ) Judge Virginia M. Kendall |
| v. | ) |
| | ) |
| ROD BLAGOJEVICH, | ) |
| | ) |
| Defendant. | ) |
| | ) |

MEMORANDUM OPINION AND ORDER

Plaintiff Stanley Buchheit ("Plaintiff") filed a complaint against Governor Rod Blagojevich ("Defendant"), alleging that Defendant improperly terminated Plaintiff from his position as Assistant Warden at the Menard Correctional Center on the basis of Plaintiff's political affiliation. After the Seventh Circuit awarded summary judgment in favor of Defendant on a substantially similar case involving two plaintiff assistant wardens, Defendant moved for summary judgment in the instant case. Rather than respond to that motion, Plaintiff filed a motion to continue discovery pursuant to Federal Rule of Civil Procedure 56(f). In light of controlling Seventh Circuit precedent directly related to the instant matter, the Court denies Plaintiff's motion to continue discovery and enters judgment in favor of Defendant.

Facts

The following facts are taken from Plaintiff's complaint. Plaintiff was employed by the Illinois Department of Corrections for 19 years, until he was terminated in early 2003. Complaint at ¶ 4. During those 19 years, Plaintiff held numerous positions with the Illinois Department of Corrections, the final position being that of Assistant Warden of Operations at the Menard

Correctional Center. *Id.* Plaintiff was appointed to the position of Assistant Warden during a Republican administration in Illinois. *Id.* By early 2003, Governor Blagojevich had assumed office as the Governor of Illinois. Plaintiff alleges that because he did not have policy-making authority in his position, he was wrongly terminated on the basis of his political affiliation, in violation of his First Amendment rights.

Procedural History

On March 19, 2004, Plaintiff filed his complaint against Defendant. On June 16, 2004, while still in the pleadings phase of the case, Plaintiff signed a stipulation that the attached job description was a "true and correct copy of a Position Description contained in the files of the Illinois Department of Central Management Services" for his former position. On July 30, 2004, with its motion for judgment on the pleadings still pending, Defendant filed an unopposed motion to stay the action pending the resolution of a potentially dispositive appeal, *Riley v. Blagojevich*, 425 F. 3d 357 (7th Cir. 2005). The Court granted the motion to stay discovery pending resolution of the *Riley* appeal.

On September 23, 2005, the Seventh Circuit decided *Riley* in favor of Defendant and against two assistant wardens holding positions substantially similar to that held by Plaintiff. The appellate court in *Riley* based its decision in part on the fact that the *Riley* plaintiffs had agreed that the job descriptions were the official descriptions of their respective positions. *Id.* at 364. Plaintiff promptly moved to withdraw his own stipulation regarding his own former job description, which motion the Court denied.

On January 6, 2006, Defendant filed a motion for summary judgment, based primarily upon the holding in *Riley*. On January 13, 2006, Plaintiff filed a motion to compel the continuation of

2

discovery pursuant to Federal Rule of Civil Procedure 56(f). On March 15, 2006, after briefing on the 56(f) motion had concluded, the parties briefed additional authority in support of Defendant's opposition to continued discovery, including a newly decided Seventh Circuit case clarifying *Riley*, *Pierson v. Blagojevich*, 437 F.3d 587 (7th Cir. 2005) (published Feb. 2006).

## The Impact of *Riley* and *Pierson*

Defendant argues that *Riley* and *Pierson* obviate the need for any further discovery in this matter, because the only two facts required to decide this case have already been discovered: (1) Plaintiff has stipulated that the job description is a "true and correct copy of a Position Description contained in the files of the Illinois Department of Central Management Services" for Plaintiff's former position, and (2) the job description has not altered since 1980, long prior to the election of Defendant.

Plaintiff argues that he cannot answer the motion for summary judgment without further discovery into the objectivity and reliability of the official description of his position. Plaintiff believes that *Riley* supports his argument, relying primarily upon the portion of the holding in *Riley* that a court's inquiry into a job description should focus on whether the job description was "reliable," through a focus on the creation and maintenance of the position description. *Riley* at 361. Plaintiff argues that this portion of *Riley* allows discovery into the procedure for "vetting and updating" his job description.

Plaintiff's argument has been addressed and refuted by both *Riley* and *Pierson*. The *Riley* court reiterated the holding of *Meeks v. Grimes* that the court's focus is "on the inherent power of the office, not what any individual officeholder actually does." *Id.* at 360-61, *quoting Meeks v.*

*Grimes*, 779 F.2d 417, 419 n.1 (7th Cir. 1985). The *Riley* court then turned to the importance of the job description, stating:

> For the job description to be the pivot on which the case turns, the inquiry must focus on how the description was created; how it is updated and thus kept realistic rather than being allowed to drift far from the actual duties of the position; in short, on how reliable, how authoritative, the description is.

*Id* at 361. The court examined the official job descriptions of two assistant wardens in Illinois, whose official job descriptions were substantially similar to that of Plaintiff, and found them to be reliable. *Id.* at 362-63. The *Riley* court specifically noted that while each job description might not exactly reflect what each assistant warden did, due to the different conditions and different personnel at each prison, the central focus of the inquiry was that each of the positions was "a *reliable* description rather than something that had been manipulated by officials seeking to expand their power to appoint loyalists beyond the lawful bounds." *Id.* at 361 (emphasis in original).

While *Riley* appeared to leave open the possibility that a plaintiff might in some circumstances conduct discovery into the reliability of a job description, the Seventh Circuit's holding in *Pierson* clarified that the official job description alone can be sufficient evidence of reliability. In *Pierson*, the appellate court summarily reversed the district court and directed judgment in favor of Defendant on the pleadings alone. The *Pierson* court stated that "an official job description, if reliable, is the correct basis for determining whether political affiliation is a legitimate requirement of the job." *Pierson*, 437 F.3d at 588, *citing Riley*, 425 F.3d at 364. To determine "reliability," the *Pierson* court looked to the facts that (i) plaintiff Pierson stipulated that the job description attached to the answer was a "true and correct copy of a Position Description contained in the files of the Illinois Department of Central Management Services" for the position held by Pierson, and (ii) the job description had been in effect from May 1999 to the present, prior

4

to the election of Governor Blagojevich. *Id.* at 588. On the basis of these two facts, the *Pierson* court directed the district court to enter judgment in favor of Defendant. *Id.*

In the matter before the court, Plaintiff signed a stipulation identical to that at issue in *Pierson*, and has not opposed Defendant's assertion that the job description has remained substantially the same since 1980. Plaintiff's job description is as follows:

> Under administrative direction of the Sr. Public Service Adm., Warden, plans, organizes and directs the entire program of Operations at the Menard Correctional Center; supervises staff, administratively responsible and accountable for the execution of policies and procedures in the management of the institution while serve as Duty Warden, develops and implements policies and procedures; gathers data regarding budgetary matters of program area.
>
> 1. Plans, organize and directs security, maintenance, Training Office, Dietary, Laundry and shift commanders; directs various department heads and their staff in order to ensure an efficient and orderly and equitable operation for both the employees and residents; confers with the Warden on any problems and decisions concerning these functions; communicates information to the Warden regarding maintenance projects; develops and implements policies and procedures. (30%)
>
> 2. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands and effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objective; counsels employees on problems with productivity and quality of work; determines staffing needs to achieve program goals and objectives; reviews activity reports. (25%)
>
> 3. Participates in carrying out the policies rules and regulations of the institution in order to ensure proper operations of the daily functions of the institution; administratively responsible and accountable for the execution of policies and procedures in the management of the institution while serving as Duty Warden; gathers data for the Operations program budget. (20%)
>
> 4. Issues decisions on disciplinary actions involving the infractions of the institution rules by the residents; holds regular interviews with residents by request in order to assist them with problems; interviews and assists employees with personal and work related problems. (10%)
>
> 5. Coordinates department heads of the Operation program to ensure that all institutional audits are conducted in the time specified; reviews prepared

documentation; coordinates corrective action based on recommendations from audit findings. (5%)

6. Conducts daily routine inspection tours of the institution for sanitation, safety and security measures; reports findings to the Chief Adm. Officer and makes recommendations for any changes, problems, or improvements. (5%)

7. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. (5%)

Stipulation, attached as Exhibit A to Defendant's Resp. to Plaintiff's Mot. to Withdraw Stipualation, Docket No. 24, filed Oct. 12, 2005. The Court, having reviewed Plaintiff's job description, finds it to be substantially similar to the descriptions for assistant wardens published in the *Riley* opinion. The *Riley* court reviewed two job descriptions, each of which varied slightly from the job description for the job held by Plaintiff. To illustrate, the Court reprints plaintiff Riley's job description in its entirety:

> Subject to administrative approval of the Warden, ... serves as Assistant Warden of Operations: formulates, organizes, and directs the overall Operations Program for Tamms Correctional Center; supervises staff; maintains and enforces disciplinary, safety, security and custodial measures; administratively responsible and accountable for execution of policies and procedures in management of the institution while serving as Duty Warden.
>
> 1. As Assistant Warden, assists in the development, establishment and implementation of rules, regulations, directives, policies and procedures of the institution to ensure proper operation of the daily functions; administratively responsible and accountable for execution of policies and procedures in management of the institution while serving as Duty Warden. (35%)
>
> 2. Plans, organizes and directs the overall Operations function and their managers, including security, physical plant operations, dietary services, inmate discipline, work camp and other miscellaneous logistical support services; coordinate[s] all inmate programs related to these functions; participates in the budget process by gathering data from department heads regarding current and anticipated programs and projects; makes recommendations to management outlining budgetary needs. (25%)

> 3. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands and effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objectives; counsels employees on problems with productivity and quality of work; determines staffing needs to achieve program goals and objectives; reviews activity reports. (15%)
>
> 4. Serves as Chairman of the Safety and Sanitation Committee; conducts routine and unscheduled safety, health, sanitation and security inspection tours throughout the institution; makes recommendations to the Warden as to any changes, problems or improvements. (10%).
>
> 5. Serves as Chairman of the Adjustment Committee; makes decisions on disciplinary problems involving infractions of the institution rules by residents; hears and resolves problems; enforces discipline. (10%).
>
> 6. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. (5 %).

*Riley*, 425 F.3d at 362. The *Riley* court determined that Riley's position, along with that of the other named plaintiff in that case, was a policy-making positions sufficient to permit Defendant to replace the job holder with a political appointee. Specifically, the *Riley* court drew attention to the portion of each of the assistant warden position descriptions requiring the assistant wardens to spend time as "Duty Warden." *Id.* at 363-64. Plaintiff's job description likewise required Plaintiff to be the Duty Warden approximately 20% of the time. The *Riley* court also looked to the budgetary, rule-making, and disciplinary job requirements of the two assistant warden plaintiffs before the court; Plaintiff in the instant case had the same responsibilities. *Id.* The factual similarity of Plaintiff's job description to that of Riley's place the case before the Court squarely under *Pierson* and *Riley*.

WHEREFORE, the Court denies Plaintiff's motion to continue discovery pursuant to Federal Rule of Civil Procedure 56(f), and enters judgment on the pleadings in favor of Defendant.

                                                   _____
                                                   VIRGINIA M. KENDALL
                                                   United States District Judge

Dated: April 5, 2006